IN RE the MARRIAGE OF: Karl James WEBERG,
Petitioner-Appellant-Cross Respondent,

v.

Mary Ann WEBERG, Respondent-Cross Appellant.

Court of Appeals

*No. 89-2124. Submitted on briefs July 18, 1990.—Decided
October 4, 1990.*

(Also reported in 463 N.W.2d 382.)

541

For the petitioner-appellant-cross respondent the cause was submitted on the briefs of *Linda S. Balisle* and *Linda D. Taplick* of *Stolper, Koritzinsky, Brewster & Neider, S.C.,* of Beloit.

For the respondent-cross appellant the cause was submitted on the briefs of *Kenneth W. Forbeck* of *Forbeck & Monahan, S.C.* of Beloit.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J.  Karl Weberg appeals from a judgment of divorce. He raises two issues: (1) whether his disability benefits are available for payment of maintenance to his former wife, Mary Ann Weberg; and (2) whether the trial court abused its discretion in failing to limit the maintenance to a specific term of years. Mary Ann Weberg cross-appeals, challenging the court's ruling that a worker's compensation settlement received by Karl

should be excluded from the marital estate. We affirm the judgment in all respects.

The Webergs were married for twenty-one years. At the time of the divorce, Karl Weberg was forty-four years old and Mary Ann Weberg was forty years old. They have two children, both of whom are adults. Prior to the marriage, Karl Weberg was severely wounded in Vietnam. He was discharged from the army with a physical disability rating of seventy percent. In spite of this disability, he worked for the Chrysler Corporation for ten years during the marriage. After he ended his employment at Chrysler in 1979, his physical status was re-evaluated by the Veterans' Administration as 100 percent permanently disabled. His current income is derived solely from disability payments. He receives Veterans' Administration benefits of $1,469 per month, social security disability benefits of $854 per month, and a disability benefit from Chrysler of $221 per month.

Mary Ann Weberg enjoys good physical and emotional health. She has been employed outside the home since 1980 and presently works forty hours per week at a clinic, earning $5.86 per hour ($234 per week).

The trial court awarded Mary Ann Weberg maintenance of $746 per month for an indefinite period. The maintenance payment, when combined with her employment income, gives her approximately forty-five percent of the parties' total combined income. The marital assets were divided fifty-fifty, each party receiving assets valued at $14,649. Karl Weberg retained as separate property the sum of $10,737, representing the remainder of a lump-sum worker's compensation settlement he had received for injuries incurred during his employment at Chrysler.

Karl Weberg argues first that his federal military disability payments and social security disability pay-

ments should not be considered by the court in awarding maintenance. He points out that his military disability payments may be assigned only if specifically permitted by statute, relying on several federal cases and 38 U.S.C. sec. 3101, which provides that veterans' benefits are only assignable to the extent authorized by law.[1] He makes the same point with respect to his social security disability benefits, referring us to 42 U.S.C. 1383(d) and 42 U.S.C. 407 which he claims prohibit the benefits from being attached by creditors, including former spouses.[2] We are not persuaded. We believe that *Leighton v. Leighton,* 81 Wis. 2d 620, 261 N.W.2d 457 (1978), controls the issue and requires rejection of Weberg's argument.

*Leighton* held that a veteran's disability pension is income to be considered in allowing maintenance rather than property to be divided at divorce. *Id.* at 637, 261 N.W.2d at 465; *see also Richardson v. Richardson,* 139 Wis. 2d 778, 783-84 n.2, 407 N.W.2d 231, 234 (1987). The *Leighton* court stated that a military disability pension "is a federally-provided replacement for earning

[1] Section 3101(a) provides: "Payments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent specifically authorized by law and such payments made to, on account of, a beneficiary shall be exempt from . . . claim[s] of creditors and shall not be liable to attachment, levy or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary."

[2] Read together, the two sections provide that "[t]he right of any person to any future payment under this title . . . shall not be transferable or assignable . . . and none of the moneys paid or payable . . . shall be subject to . . . attachment . . . or other legal process."

capacity lost . . .. It is analogous to a disability benefit paid under the Social Security Act to a disabled or handicapped worker . . .. [The payments are] income to the defendant, material only to his ability to pay alimony, if alimony were awarded." *Id.* at 636–37, 261 N.W.2d at 465.

We also reject Weberg's assertion that *Leighton* is no longer persuasive because of *McCarty v. McCarty,* 453 U.S. 210 (1981), and its progeny, notably *Mansell v. Mansell,* 490 U.S. 581 (1989), on which he places principal reliance. The issue in *Mansell,* however, was whether "military retirement pay waived by the retiree in order to receive veterans' disability benefits" could be treated as property to be divided between divorcing parties under the language of the Uniformed Services Former Spouses Protection Act, 10 U.S.C. sec. 1408. The Court concluded that the waived retirement pay could not be treated as divisible property upon divorce.

In this case we are not asked to divide Weberg's benefits or award any portion thereof to his wife. We are to decide only whether the payments Weberg is presently receiving may be considered by the court as a factor in assessing his ability to pay spousal maintenance. We thus consider *Mansell* to be distinguishable on the facts and reject Weberg's claim that it mandates reversal.

Weberg next argues that the trial court abused its discretion by awarding maintenance to Mary Ann Weberg without considering her needs, his ability to pay, and the effects of the property division. He also maintains that the award disregarded the fairness objectives of *LaRocque v. LaRocque,* 139 Wis. 2d 23, 33, 406 N.W.2d 736, 740 (1987), because it did not take into account the source of his income (disability payments) and was not limited in time.

Whether to award maintenance—and the duration and amount thereof if an award is to be made—are matters committed to the sound discretion of the trial court. *Bahr v. Bahr,* 107 Wis. 2d 72, 77, 318 N.W.2d 391, 395 (1982). Generally, we look for reasons to sustain the trial court's discretionary decision, *Loomans v. Milwaukee Mut. Ins. Co.,* 38 Wis. 2d 656, 662, 158 N.W.2d 318, 320 (1968), and we need not agree with the decision to sustain it. *Independent Milk Producers Co-op v. Stoffel,* 102 Wis. 2d 1, 12, 298 N.W.2d 102, 107 (Ct. App. 1980). Because the exercise of discretion "is not the equivalent of unfettered decision-making," in order to sustain a discretionary determination we must be able to see that the court made a "reasoned application of . . . the appropriate legal standard[s] to the relevant facts in the case." *Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 471, 326 N.W.2d 727, 732 (1982), quoting *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981). Thus, "if the record shows that discretion was in fact exercised and we can perceive a reasonable basis for the court's decision," we will affirm. *Prahl v. Brosamle,* 142 Wis. 2d 658, 667, 420 N.W.2d 372, 376 (Ct. App. 1987).

When fixing maintenance, the starting point is sec. 767.26, Stats., which sets forth several specific factors to be considered by the court and concludes with a "catch-all" provision allowing the court to consider any other factors it may deem relevant. *Parrett v. Parrett,* 146 Wis. 2d 830, 837, 432 N.W.2d 664, 667 (1988). The enumerated factors are designed to further the general objectives of maintenance, which are "to support the recipient spouse in accordance with the needs and earning capacities of the parties (the support objective) and to ensure a fair and equitable financial arrangement between the

parties in each individual case (the fairness objective)."
*LaRocque,* 139 Wis. 2d at 33, 406 N.W.2d at 740.

The record satisfies us that the trial court properly exercised its discretion. The court gave careful and extensive consideration to each of the statutory factors in light of the facts of the case and reached a reasoned and reasonable result. Although the court did not make a specific finding of Mary Ann Weberg's needs, it considered those needs as reflected in her budget in arriving at its decision. And despite Weberg's contrary assertion, the trial court repeatedly referred to the property agreement in its findings.

We also believe that the fairness objective of *LaRocque* was met by the court's award. The court did not mechanically apply a fifty-fifty formula to determine maintenance. It considered whether each party was likely to attain a pre-divorce standard of living in the future, taking into account the nature and the sources of their incomes, their future earning potential, and the taxes each must pay. The court then awarded Mary Ann Weberg forty-five percent of their total combined income, stating that the less-than-equal award would give her "an incentive to apply herself . . . [and] utilize the talents that . . . she has." The court also stated that, because of Karl Weberg's disability, "it is fair and equitable to give him a larger share of the total income of the parties." The court's discretionary determination was thus the "product of a rational mental process by which the facts of record and law relied upon [were] stated and . . . considered together for the purpose of achieving a reasoned and reasonable determination." *LaRocque,* 139 Wis. 2d at 27, 406 N.W.2d at 737. There was no abuse of discretion.

As we have noted, the trial court denied Mary Ann Weberg's request that a bank account containing the remainder of a worker's compensation settlement for job-related injuries suffered by Karl several years prior to the divorce be treated as marital property and divided equally between them. We reject her challenge to that ruling.

■

Decisions relating to the division of marital property are reviewed for abuse of the trial court's discretion under the standards we have discussed earlier in this opinion. *Asbeck v. Asbeck,* 116 Wis. 2d 289, 293, 342 N.W.2d 750, 752 (Ct. App. 1983).

Section 767.255, Stats., provides that all property of the parties to a divorce—other than that acquired by one of them through gift, bequest, devise or inheritance—is subject to division. Thus, we have held that "since [a personal injury] settlement was not a gift, bequest, devise or inheritance, it must be a divisible asset." *Mack v. Mack,* 108 Wis. 2d 604, 608, 323 N.W.2d 153, 154–55 (Ct. App. 1982).

Karl Weberg suggests, however, that the supreme court in *Richardson* and *Krebs* created a presumption that personal injury settlements remain the property of the injured spouse. *Richardson* did establish such a presumption; but the language of the opinion limited its application to inchoate claims—those which, at the time of the divorce "[have] not resulted in either a judgment or a settlement . . .." *Id.,* 139 Wis. 2d at 785, 407 N.W.2d at 234. *Krebs* applied the "logic of *Richardson*" to payments to be made in the future to one spouse under a structured settlement of a personal injury claim. *Krebs* at 57, 435 N.W.2d at 243.

In this case, we believe the logic of *Richardson* and *Krebs* would make the presumption equally applicable to

a situation where the claim is not inchoate or payable at some future time but already has been made. The *Richardson* court outlined its reasoning as follows:

[C]ompensation for loss of bodily function, for pain and suffering and for future earnings replaces what was lost due to a personal injury. Just as each spouse is entitled to leave the marriage with his or her body, so the presumption should be that each spouse is entitled to leave the marriage with that which is designed to replace or compensate for a healthy body. We therefore conclude that the statutory presumption of equal division should be altered . . .. Instead of presuming equal distribution of a personal injury claim, the court should presume that the injured party is entitled to all of the compensation for pain, suffering, bodily injury and future earnings. *Richardson,* 139 Wis. 2d at 786, 407 N.W.2d at 234–35.[3]

---

[3]*Richardson* limited application of the presumption to compensation for personal injury and future earnings, stating that for other elements of damages, "such as those that compensate for medical or other expenses and lost earnings incurred during the marriage, the court should presume equal distribution." *Id.,* 139 Wis. 2d at 786, 407 N.W.2d at 235.

In *Krebs,* however, the court appears to have dropped the qualification, for there the structured settlement did not distinguish among the various elements of damage, yet the court applied the *Richardson* presumption. After quoting the rule—and its limitation—from *Richardson,* the *Krebs* court stated: "In spite of the lack of identification of separate amounts making up the structured settlement, we believe that the logic of *Richardson* applies and the trial court should employ the presumption that the injured [spouse] is entitled to the remainder of the settlement." *Krebs,* 148 Wis. 2d at 57, 435 N.W.2d at 243.

The same is true here. The record of Weberg's settlement does not disclose any division or separation based on type of damage. Under *Krebs,* that fact is immaterial and the presump-

The trial court, of course, must still consider the factors set out in sec. 767.255, Stats. Thus, "the court may alter the presumed distribution [retention of the settlement by the injured spouse] after considering the special circumstances of the personal injury claim . . . and of the parties under the statutory factors listed in sec. 767.255." *Krebs* at 58, 435 N.W.2d at 244, quoting *Richardson*, 139 Wis. 2d at 786, 407 N.W.2d at 235.

Here, Mary Ann Weberg contends that the settlement funds are marital property because they were co-mingled with marital funds when they were transferred to a joint account and used, in part at least, "for joint and family purposes."

The trial court, rejecting that argument, found that: (1) the funds with which the account was opened were the proceeds of Weberg's worker's compensation settlement; (2) while they were placed in a joint account, these funds "were not co-mingled" with marital assets; and (3) although some monies withdrawn from the account were used for alleged "family" purposes, the account was held jointly only "for the purpose of protecting [Mary Ann Weberg] in the event of [Karl's] death."

Karl Weberg testified that the settlement funds were placed in a joint account with his wife so that she would be the beneficiary of the account in case something happened to him. There also was evidence that occasional withdrawals from the account were used to pay the couple's debts.

There was no evidence that the funds were co-mingled with other marital assets. Nor do we believe that the fact that Weberg may have used some of the interest generated by the account, and some of the principal, to pay marital debts invalidates the court's findings.

tion that the settlement remains the property of the injured person is fully applicable.

Weberg is not seeking a credit for the withdrawals from the account nor does the trial court's decision allow such a credit. It awarded him the balance of the funds, and we think that was appropriate.

In *In re Popp,* 146 Wis. 2d 778, 432 N.W.2d 600 (Ct. App. 1988), a divorcing wife attempted to have her husband's interest in a corporation—he had received several shares of stock as a gift—declared a marital asset available for division. While gifted property is exempt from division by statute, and a personal injury settlement is presumptively exempt by court decision, we see little difference in principle between the two when the issue is whether the exemption is lost by reason of co-mingling or, in the words of *Popp,* "[t]ransmutation of non-marital property to marital property." *Popp* at 788, 432 N.W.2d at 603.

In *Popp,* the wife sought access to the stock on grounds that certain assets of the corporation had been used by the husband for marital purposes, and the trial court found in her favor. We overruled, holding that while the corporate assets used for marital purposes and to purchase "marital items" were lost to the husband, the remaining shares had retained their identity as gifted property and could not be considered part of the marital estate. *Id.* at 788–89, 432 N.W.2d at 603. In reaching that conclusion, we also noted the absence of any "donative intent (actual or constructive) on [the husband's] part" which would support a finding that he "expressly or impliedly indicated that he wished or intended to . . . convert [the shares] to marital property." *Id.* at 789, 432 N.W.2d at 603.[4]

---

[4]In *Popp,* we quoted a statement from *Brandt v. Brandt,* 145 Wis. 2d 394, 427 N.W.2d 126 (Ct. App. 1988), a case in which the issue was the divisibility of an investment bank account initially

The trial court's findings that Weberg's settlement funds were not co-mingled so as to change their identity to marital property are not clearly erroneous, and the court's resolution of this issue evidences a rational process based on and consistent with the applicable law as developed in *Richardson, Krebs* and *Popp.* Given that, and because the result was one a reasonable court could reach, the trial court did not abuse its discretion in excluding the challenged account from the marital estate.

*By the Court.*—Judgment affirmed.

SUNDBY, J. *(concurring).* This appeal presents an important family law question which is not answered by any Wisconsin decision: Does a Wisconsin court have jurisdiction under sec. 767.26, Stats., to include Veter-

---

funded by the wife's inherited property. During the course of the marriage, however, deposits, additions and withdrawals were made to the account as part of the couple's unusually widespread investment and banking activities involving at least thirty different sole and joint investment, savings and checking accounts. Because the couple's funds "regularly flowed into, out of, and back and forth between all of these accounts"—including the wife's investment account—we were unable to trace the funds remaining in that account to the original inheritance. We noted, however, that had the "countless transactions" undertaken with respect to the investment account been limited to withdrawals—as is the case here—"a commingling problem would not be present since the account, although diminished, would still consist of inherited assets." *Id.* at 413, 427 N.W.2d at 133.

We believe that is the case here. There is no dispute that the account in issue was funded with Weberg's personal injury settlement; all that occurred since it was opened was that some withdrawals were made for family purposes. That does not change the remainder of the account to marital property.

ans' Administration benefits, received as compensation for a service-connected disability, as income in determining maintenance? I write separately on this question because I do not believe that the Wisconsin decisions, including *Leighton v. Leighton,* 81 Wis. 2d 620, 261 N.W.2d 457 (1978), on which the majority relies, answers this question.

In *Leighton,* the wife contended that in dividing the parties' property, the trial court should have considered the present value of the monthly veterans' disability benefits that the husband was receiving. The court rejected her contention explaining, "We . . . view the disability benefits in the case before us as income to the [husband], material only to his ability to pay alimony, if alimony were awarded." *Id.* at 637, 261 N.W.2d at 465. The court relied on *Kronforst v. Kronforst,* 21 Wis. 2d 54, 123 N.W.2d 528 (1963) where the court treated the husband's social security disability benefit as income in determining an appropriate alimony award and not as an asset in the division of the marital estate.

Neither *Kronforst* nor *Leighton* considered 38 U.S.C. sec. 3101(a) or any of its predecessors. However, this statute was considered in *Pfeil v. Pfeil,* 115 Wis. 2d 502, 341 N.W.2d 699 (Ct. App. 1983). Section 3101(a) provides in part:

> Payments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary . . ..

In *Pfeil,* the court held that military service disability benefits, which had not lost their exempt status, were not assets subject to division as part of the marital assets of the parties. Further, the court said that such benefits could not be considered by the trial court to justify an offsetting award to the wife. The court relied on 38 U.S.C. sec. 3101(a) (1979), *Hisquierdo v. Hisquierdo,* 439 U.S. 572 (1979) and *McCarty v. McCarty,* 453 U.S. 210 (1981).

However, the *Pfeil* court was not faced with the question of whether U.S.C. sec. 3101(a) precluded consideration of military service disability benefits in determining child support or alimony (maintenance). In *Hisquierdo,* the Court held that a statute similar to sec. 3101(a) but applicable to Railroad Retirement Act disability and retirement benefits, precluded a California community property award to the wife in a suit for dissolution of a marriage. In *McCarty,* the Court held that federal law precluded a state court from dividing military *nondisability* retired pay pursuant to state community property laws, upon dissolution of a marriage. Thus, none of these cases considered whether military service disability benefits could be used in determining maintenance or child support in a divorce action.

In *In re Gardner,* 220 Wis. 493, 264 N.W. 643 (1936), the court held that a divorced wife awarded child support was not a "creditor" of the disabled veteran within the federal exemption statute, and hence was entitled to payment of accrued support money from accumulated government payments made to the veteran's guardian. At that time, however, the predecessor to 38 U.S.C. sec. 3101(a) applied to "money due, or to become due," to any pensioner. Section 3101(a) now extends to payments "made to, or on account of, a beneficiary" under any of the laws relating to veterans. In

*Rose v. Rose,* 481 U.S. 619, 624 n.2 (1987), the appellant and the solicitor general cited *Gardner* in support of their contention that the lower courts are divided on the issue of whether state courts may award alimony or child support out of benefits paid to a disabled veteran.

In *Rose,* the Court held that a Tennessee statute allowing state courts to require veterans to pay child support out of federal veterans' disability benefits was not preempted by federal law. One of the federal statutes the appellant in *Rose* relied on was 38 U.S.C. sec. 3101(a). The Court said that the legislative history of this section recognizes two purposes: (1) To avoid the possibility of the Veterans' Administration being placed in the position of a collection agency; and (2) to prevent the deprivation and depletion of the means of subsistence of veterans dependent upon these benefits as the main source of their income. *Rose,* 481 U.S. at 630.

The Court held that neither purpose was constrained by allowing the state court to hold appellant in contempt for failing to pay child support. The Court said that "the exercise of state-court jurisdiction over appellant's disability benefits [did not] deprive appellant of his means of subsistence contrary to Congress' intent, for these benefits are not provided to support appellant alone." The Court pointed to S. Rep. No. 98–604, at 24 (1984) which states that veterans' disability benefits are intended to "provide reasonable and adequate compensation for disabled veterans *and their families."* *Rose,* 481 U.S. at 630 (emphasis supplied by *Rose* court). The Court further said that, "as evidenced by sec. 3107(a)(2), the provision for apportionment . . . Congress clearly intended veterans' disability benefits to be used, in part, for the support of veterans' dependents." *Id.* at 631.

It was on this basis that the Court distinguished such cases as *Wissner v. Wissner,* 338 U.S. 655 (1950)

(widow did not have community property claim to one-half the proceeds of life insurance policy of her deceased army officer husband), *Hisquierdo,* and *Ridgway v. Ridgway,* 454 U.S. 46 (1981) (state court's divorce decree preempted by federal statute giving army officer husband unqualified right to designate life insurance policy beneficiary). The Court pointed out that consistent with the distinction suggested in *Wissner,* Congress had amended the Social Security Act to authorize garnishment of certain federal benefits for spousal and child support, but not for community property divisions. *Rose,* 481 U.S. 632 n.6 (citing 42 U.S.C. secs. 659 and 662). The Court said:

> We construed these amendments to "expressly override" the anti-attachment provision for support claims, finding it "logical to conclude that Congress . . . thought that a family's need for support could justify garnishment, even though it deflected other federal benefit programs from their intended goals, but that community property claims, which are not based on need, could not do so."

*Id.* (quoting *Hisquierdo,* 439 U.S. at 587).

The Court noted that the critical difference between *Ridgway* and the case before it was that Congress had not made appellant the exclusive beneficiary of the disability benefits. *Rose,* 481 U.S. at 634.

> As we have demonstrated, these benefits are intended to support not only the veteran, but the veteran's family as well. Recognizing an exception to the application of sec. 3101(a)'s prohibition against attachment, levy, or seizure in this context would further, not undermine, the federal purpose in providing these benefits.

*Id.* The Court noted that in *Hisquierdo,* the Court had "again" discussed an exception to the anti-garnishment statute for alimony and child support in noncommunity property cases. *Rose,* 481 U.S. at 632 (citing *Hisquierdo,* 439 U.S. at 587. The *Rose* court stated that the suggested basis for the *Wissner* exception "was that family support obligations are deeply rooted moral responsibilities, while the community property concept is more akin to an amoral business relationship." *Rose,* 481 U.S. at 632 (citing *Wissner,* 338 U.S. at 660).

These cases convince me that *Mansell v. Mansell* 490 U.S. 581, 109 S. Ct. 2023, 104 L. Ed. 2d 675 (1989) does not place veterans' disability benefits beyond the reach of a Wisconsin trial court in determining a maintenance award. Appellant argues that the result in *Mansell*—exclusion of waived military retirement pay from property divisible upon divorce—"is a clear indication that Congress did not intend that veterans' disability payments would be included in assets divided in a divorce." However, the Former Spouses' Protection Act deals only with military *retirement* pay, not disability payments. As the *Mansell* Court notes, the Act was enacted "[i]n direct response to *McCarty.*" *Mansell,* 104 L. Ed. 2d at 682. *McCarty* held that the federal statutes then governing military retirement pay prevented state courts from treating military retirement pay as community property. Had the congress intended that the Act was to apply to military disability pay, it presumably would have said so.

Congress must be presumed to have been aware of the decisions distinguishing between retirement pay and disability pay, insofar as such pay is subject to the anti-attachment statute. The Act authorized state courts to treat "disposable retired or retainer pay" as community property. *Id.* (citing 10 U.S.C. sec. 1408(c)(1)). "Dispos-

able retired or retainer pay" is defined as "the total monthly retired or retainer pay to which a military member is entitled," minus certain deductions. *Id.* (citing 10 U.S.C. sec. 1408(a)(4) (1982 ed., Supp. V)). Among the amounts required to be deducted from total pay are any amounts waived in order to receive disability benefits. *Mansell,* 104 L. Ed. 2d at 682–83 (citing 10 U.S.C. sec. 1408(a)(4)(B)).

Unlike the appellant, I find nothing in the Former Spouses' Protection Act or *Mansell* which provides any indication, clear or otherwise, that Congress did not intend that veterans' disability benefits would be included in assets divided in a divorce. The Act and *Mansell* are simply silent as to disability pay except that any retirement pay waived to receive disability benefits may be treated by state courts as community property military retirement pay. Presumably, the same result would be reached in an equitable distribution state. *See Mansell,* 104 L. Ed. 2d at 682 n.2.

I conclude from the foregoing that veterans' disability benefits continue to be benefits available to the veteran *and his or her family.* Such benefits are therefore subject to a Wisconsin state court's authority to consider veterans' disability benefits in determining child support or maintenance.